UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

SHANNA SMITH,

        Defendant.

19-CR-146
DECISION & ORDER

---

On July 11, 2019, a grand jury indicted the defendant, Shanna Smith, on two felony counts related to testimony she provided before a different grand jury in July 2018. The 2019 grand jury charged that Smith had made false declarations, in violation of 18 U.S.C. § 1623(a), and obstructed justice, in violation of 18 U.S.C. § 1512(c)(2). *See* Docket Item 1. On March 25, 2020, Smith moved to suppress her grand jury testimony and dismiss the indictment, or, in the alternative, to disqualify the prosecuting attorney from trying her case. *See* Docket Item 33. The government opposed that motion on April 13, 2020, Docket Item 39. Smith did not reply, and her deadline to do so now has passed. *See* Docket Item 35.

For the reasons that follow, this Court denies Smith's motion in its entirety.

## **BACKGROUND**

In May 2017, a grand jury began investigating the activities of the "CBL/BFL street gang." Docket Item 39-1 at 3-4. The investigation focused in part on the activities of Dalvon Curry, including his possible involvement in the December 2015

murder of Jacquan Sullivan and the December 2016 murder of Xavier Wimes.  *Id.* at 4-6.  Curry is Smith's cousin.  *Id.* at 5.

On December 15, 2015, the Buffalo Police Department ("BPD") interviewed Curry about Sullivan's death.  *Id.*  Curry claimed that he was with Smith at the time of the murder.  *Id.*  BPD then interviewed Smith on December 28, 2015.  *See* Docket Item 33 at 24-25.  She confirmed Curry's alibi, asserting that Curry was at home with her the entire day in question.  *Id.*

On July 6, 2018, the grand jury subpoenaed Smith, ordering her to testify on July 31, 2018.  *See* Docket Item 39-2.  According to the FBI special agent in charge of the investigation, Smith was "not a target" but a "fact witness" whose testimony was relevant because Curry "had invoked [Smith] as an alibi witness. . . .  The FBI had no information she [had] engaged in any illegal activity in connection with the CBL/BFL gang."  Docket Item 39-1 at 6.

An FBI special agent attests that he and a BPD detective personally served Smith with the subpoena on July 11, 2018.  Docket Item 39-3 at 4.  Smith denies that she ever received a subpoena.  *See* Docket Item 33 at 1.  The subpoena itself lacks any indication of having been served, *see* Docket Item 39-2 at 3, a fact the agent acknowledges but chalks up to having been "so busy that day meeting with witnesses and serving other subpoenas," Docket Item 39-3 at 4.

The agent further attests that after serving the subpoena, he and the detective interviewed Smith about the Sullivan murder.  Smith initially repeated her prior statement confirming Curry's alibi.  *See id.* at 4-5; Docket Item 39-5 at 1.  But after the detective showed Smith video footage of Curry out and about on the day in question—

and therefore not at home with her all day as she had said—Smith recanted.  Docket Item 39-5 at 1.  Apparently without prompting, Smith also said that she was with Curry the night of the Wimes murder.  Docket Item 39-3 at 5; Docket Item 39-5 at 1-2.

Smith appeared before the grand jury on July 31, 2018.  *See* Docket Item 39-1 at 7.  Smith alleges that she was "seized" from her grandmother's house, Docket Item 33 at 4, but an FBI officer asserts that Smith voluntarily agreed to be transported to the grand jury and that she was "not threatened or coerced in any way," Docket Item 39-4 at 3-4.  Assistant United States Attorney ("AUSA") Seth Molisani informed Smith that she was not a target of the investigation but that she was required to tell the truth; if she lied, he told her, she could be charged with perjury.  Docket Item 39-1 at 7-8.  Smith asserts that she was never advised of her Fifth and Sixth Amendment rights.  Docket Item 33 at 5.  The government does not refute that assertion, instead arguing that no such warning was required under the circumstances.  *See* Docket Item 39.

Smith also asserts that she was intoxicated when she testified.  Docket Item 33 at 6.  The special agent refutes that assertion as well, Docket Item 39-1 at 8-9, and also notes Smith's testimony before the grand jury specifically denying that she was "under the influence of any alcohol . . . [or] any other drugs or medications," Docket Item 33 at 75.

AUSA Molisani led the questioning.  Smith first swore that she would provide truthful testimony.  *See* Docket Item 33 at 38.  With respect to the events surrounding the Wimes shooting, she testified as follows:

> QUESTION: And so you saw [Xavier Wimes ("Zave")] running. Where were you and your cousin Dalvon at that time after you saw him flop out of the window and get up and start running?
>
> ANSWER: On the grass.

3

QUESTION: How far away from where Zave landed would you say that you and your cousin were?

ANSWER: Probably about where you at to where I'm at.

QUESTION: Would you say that's ten to 15 feet?

ANSWER: Probably a little further.

QUESTION: Do you think we're more than ten to 15 feet apart?

ANSWER: Yes. Probably near that table. That's how far it was.

QUESTION: Still pretty close though?

ANSWER: Yeah.

QUESTION: What happened? What did you see happen as Zave ran toward the parking lot?

ANSWER: Everybody ran after him.

QUESTION: Where did these people that you were referring to as everybody, where did you see them come from?

ANSWER: Out the building.

QUESTION: Did they come running right by you?

ANSWER: Yeah, out the front door.

QUESTION: Okay. And how many people were chasing Zave at that point?

ANSWER: Twenty. All the guys.

QUESTION: And what did you see happen?

ANSWER: Zave was fighting them, but I didn't—then I heard gunshots, but I didn't see who shot him. I just heard gunshots.

QUESTION: Could you see—you said Zave was running. As this group chased him did they catch up to him? What happened?

ANSWER: With the gun?

QUESTION: So no one was actually around Zave when he was shot?

ANSWER: I mean, everybody was around them because they was all trying to fight him, but somebody pulled out the gun and shot him.

4

QUESTION: How many shots did you hear?

ANSWER: Like six.

QUESTION: And after the shots what did you see happen?

ANSWER: Everybody run.

QUESTION: Those twenty people ran?

ANSWER: Yeah, but the cops was already in the Towne Gardens.

QUESTION: You could see the police arrive?

ANSWER: Yes.

QUESTION: Where did you see the police car?

ANSWER: Driving on the grass.

QUESTION: Are you talking about the same grass where everybody had run out?

ANSWER: Yes.

QUESTION: And where were you and your cousin at that point?

ANSWER: I was picking him up. We was running, but the gun was on the ground in the grass near the sidewalk.

QUESTION: You actually saw the gun?

ANSWER: Yeah.

QUESTION: Did you see how the gun got there?

ANSWER: Probably somebody threw it.

QUESTION: You didn't see anyone throw it though?

ANSWER: No.

QUESTION: It was just a gun that happened to be on the grass?

ANSWER: Yeah, and Dal picked it up. I mean, he was probably trying to take it, but he threw it in the bushes when he saw the cops.

QUESTION: So while you were carrying Dal how does he go about picking up this gun?

5

ANSWER: I mean, I wasn't really carrying him because he was conscious then, but I was holding him on my shoulders.

QUESTION: And so did you walk over with him then to pick up the gun?

ANSWER: Yeah because I had him on my shoulder.

QUESTION: Did you say anything to him as the two of you were walking towards the gun?

ANSWER: I don't remember. I just remember him picking it up and throwing it in the bushes.

. . .

QUESTION: After you saw your cousin throw the gun into the bushes where did you go next?

ANSWER: We ran into the car cuz the door was open.

QUESTION: You two are both running?

ANSWER: I mean, yeah, but I'm still holding him as we run into the car.

QUESTION: Is there a reason why you walked toward where people had been shooting to pick up the gun?

ANSWER: Yes. That's where the parking lot at. That's how you get out of the Towne Gardens.

QUESTION: You had to walk in the direction of the shooting before you could get to the parking lot?

ANSWER: Yeah.

QUESTION: And so you said after your cousin Dalvon throws the gun into the bushes the two of you run?

ANSWER: Yeah, to this black car.

QUESTION: And why did you run to the black car?

ANSWER: Because his head was gushing and he had to go to the hospital.

QUESTION: And why that particular car though?

ANSWER: Because the door was open.

QUESTION: Okay. Did you know the owner of that vehicle?

6

ANSWER: No.

QUESTION: Did you get in the car?

ANSWER: Yes.

QUESTION: Did your cousin Dalvon Curry also get in the car?

ANSWER: Yes.

. . .

QUESTION: And did you know the owner or the person that got in the car?

ANSWER: No.

QUESTION: Did you have a conversation with that person?

ANSWER: Yes. I asked him to take me to the hospital.

. . .

QUESTION: And where did you go from the Towne Gardens parking lot?

ANSWER: To Buffalo General.

QUESTION: And what happened when you arrived at Buffalo General?

ANSWER: He dropped us off at the corner.

QUESTION: Did you tell him to take you all the way to the hospital?

ANSWER: No. I told him to drop us off at General, Buffalo.

QUESTION: What happened when you got dropped off at the corner? Did you help your cousin? Did you carry him toward the hospital?

ANSWER: Me and him both walked to the hospital.

QUESTION: Were you still kind of carrying him at that point or was he walking on his own power?

ANSWER: A little of both.

QUESTION: And what happened when you got inside the hospital?

>    ANSWER:   They took him in the back. I didn't stay, though. I waited until his mother came and then I left.

Docket Item 33 at 57-63.

A different grand jury indicted Smith on July 11, 2019, charging that she made false declarations, in violation of 18 U.S.C. § 1623(a), and obstructed justice, in violation of 18 U.S.C. § 1512(c)(2).  *See* Docket Item 1.  More specifically, the indictment alleges that Smith falsely testified that she (1) observed 20 individuals chase Wimes, (2) observed Curry retrieve a firearm from the grass, (3) helped Curry to a parking lot, and (4) accompanied Curry to the hospital.  *Id.* at 8, 10.

In a separate indictment, Curry was charged with, among other things, two counts of murder in aid of racketeering.  Docket Item 39-1 at 10.  In February 2020, Curry was convicted of all charges.  *Id.*  Smith now moves to dismiss the indictment against her.  Docket Item 33.

## **DISCUSSION**

Smith asserts four separate grounds for dismissing the indictment.  First, she argues that the government impermissibly posed ambiguous questions before the grand jury.  Docket Item 33 at 14-15.  Second, she argues that the government violated her rights under the Fourteenth Amendment to the United States Constitution by setting a "perjury trap."  *Id.* at 15-16.  Third, she argues that the government violated her rights under the Fifth and Sixth Amendments by not advising her that she could remain silent and/or secure counsel free of charge.  *Id.* at 16-17.  Finally, Smith argues that even if the government did not, strictly speaking, violate any of her constitutional rights, this Court still should exercise its supervisory power to suppress her testimony, and

8

consequently dismiss the indictment, because the government's conduct was "outrageous." *Id.* at 17-19.

This Court is not persuaded by any of these arguments.

### A.     Ambiguous Questions

Smith first argues that because the government's questions before the grand jury were vague, her responses to those questions cannot serve as the basis for a perjury prosecution. Docket Item 33 at 14-15.

"A perjury conviction must rest on the utterance by the accused of a false statement; it may not stand on a particular interpretation that a questioner places upon an answer." *United States v. Lighte,* 782 F.2d 367, 375 (2d Cir.1986). For that reason, "[w]hen a line of questioning is so vague as to be fundamentally ambiguous, the answers associated with the questions posed may be insufficient as a matter of law to support the perjury conviction." *Id.* (citation omitted). "A question is fundamentally ambiguous when it is not a phrase with a meaning about which [persons] of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony." *Id.*

Here, Smith argues, without citing any particular portion of her testimony, that "the government's disjoint[ed] [g]rand [j]ury examination . . . resembles an Abbott and Costello routine." Docket Item 33 at 15. This Court finds no merit to Smith's argument. The questioning tracked a chronological timeline, and the testimony specifically charged as false was offered in response to clear, simple, and precise questions.

For example, with respect to the first allegation in the indictment—that Smith falsely testified that she observed 20 individuals chase Wimes—the government asked, "What happened?  What did you see happen as Zave ran toward the parking lot?" Docket Item 33 at 58.  Smith answered, "Everybody ran after him."  *Id.*  After clarifying where these individuals came from, the government asked, "And how many people were chasing Zave at that point?"  *Id.*  Smith responded, "Twenty. All the guys."  *Id.*  With respect to the second allegation—that Smith falsely stated that she observed Curry retrieve a firearm from the grass—the government asked Smith,

> QUESTION: And where were you and your cousin at that point?
>
> ANSWER: I was picking him up.  We was running, but the gun was on the ground in the grass near the sidewalk.
>
> QUESTION: You actually saw the gun?
>
> ANSWER: Yeah.
>
> QUESTION: Did you see how the gun got there?
>
> ANSWER: Probably somebody threw it.
>
> QUESTION: You didn't see anyone throw it though?
>
> ANSWER: No.
>
> QUESTION: It was just a gun that happened to be on the grass?
>
> ANSWER: Yeah, and Dal picked it up.  I mean, he was probably trying to take it, but he threw it in the bushes when he saw the cops.

*Id.* at 59-60.  With respect to the third allegation—that Smith falsely stated that she helped Curry to a parking lot—the government asked Smith, "After you saw your cousin throw the gun into the bushes where did you go next?"  *Id.* at 60.  She responded, "We ran into the car cuz the door was open."  *Id.*  And finally, with respect to the final allegation—that Smith falsely stated she accompanied Curry to the hospital—the

10

government asked Smith, "And where did you go from the Towne Gardens parking lot?" *Id.* at 62.  She responded, "To Buffalo General [Hospital]." *Id.* at 63.

There is nothing ambiguous or otherwise misleading in that line of questioning. Nor is there any evidence in Smith's responses that she was confused by the questions. Smith's first argument therefore lacks merit.

### B.     Perjury Trap

Smith also argues that the government impermissibly set a "perjury trap" for her by requiring her to testify when it knew that she would provide false testimony.  *See* Docket Item 33 at 15-16.

"A 'perjury trap' is created when the government calls a witness . . . for the primary purpose of obtaining testimony from him in order to prosecute him later for perjury."  *Wheel v. Robinson*, 34 F.3d 60, 67-68 (2d Cir. 1994) (quoting *United States v. Chen*, 933 F.2d 793, 796-97 (9th Cir. 1991)) (additional citations omitted).  The Second Circuit "has discussed but has never adopted the 'perjury trap' doctrine."  *United States v. Balkany*, 468 F. App'x 49, 53 (2d Cir. 2012) (summary order) (citing *United States v. Regan,* 103 F.3d 1072, 1079 (2d Cir.1997); *Wheel*, 34 F.3d at 67).  Rather, whenever the Circuit has considered a possible "perjury trap" defense, it has found that "the existence of a 'legitimate basis' for [the] investigation and for [the] particular questions answered falsely preclude[d] 'any application of the 'perjury trap' doctrine.'"  *Regan*, 103 F.3d at 1079 (quoting *Wheel,* 34 F.3d at 68); *see also Balkany*, 468 F. App'x at 53.

This Court similarly need not decide whether a defendant may invoke the perjury trap defense because, even assuming it exists, it would not apply here.  The grand jury was investigating Curry's possible involvement in two murders.  *Id.* Docket Item 39-1 at

11

4-6. Curry claimed that Smith was with her at the time of one of those murders, an assertion she originally corroborated but later refuted. *See* Docket Item 33 at 24-25; Docket Item 39-5 at 1. Smith also claimed that she was with Curry on the night of the second murder. *See id.* at 1-2.

The government had a "legitimate basis" for its investigation into Curry's whereabouts on the two evenings in question, and Smith had information highly relevant to that inquiry—information that the government's questions sought to elicit. What is more, the government had no indication that Smith would testify falsely before the grand jury, as she had recanted her prior (false) statement when shown a video showing that Curry could not have been with her the entire day of the first murder, as she previously had claimed. Smith can hardly be heard to complain about having been brought before a grand jury to refute the alibi of someone suspected of murder or having been asked about her alleged presence at another murder scene. Smith's second argument therefore lacks merit as well.

### C. Fifth and Sixth Amendment Rights

Smith also argues that the government violated her Fifth and Sixth Amendment rights when it failed to advise her of the privileges afforded by those amendments before she testified. *See* Docket item 33 at 16-17.

"When called by the grand jury, witnesses are . . . legally bound to give testimony . . . unless some recognized privilege is asserted." *United States v. Mandujano*, 425 U.S. 564, 572 (1976) (citations omitted). One such privilege is the Fifth Amendment right against compelled self-incrimination. *Id.* at 572-73. "[T]he Fifth Amendment privilege," however, "does not condone perjury." *United States v. Wong*, 431 U.S. 174,

178 (1977). As such, the Supreme Court has "consistently[,] indeed without exception[,] allowed sanctions for false statements or perjury . . . even in instances where the perjurer complained that the [g]overnment exceeded its constitutional powers in making the inquiry." *Mandujano*, 425 U.S. at 577.

This case is no exception. Even assuming the government should have advised Smith of her Fifth Amendment rights prior to her testifying, any such error would not entitle her to suppression of that testimony. "[I]t cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the [g]overnment should not have asked. Our legal system provides methods for challenging the [g]overnment's right to ask questions—lying is not one of them." *Id.* (quoting *Bryson v. United States*, 396 U.S. 64, 72 (1969)).

Smith fares no better with respect to her argument under the Sixth Amendment. The Sixth Amendment guarantees indigent criminal defendants the right to counsel. *See generally Gideon v. Wainwright*, 372 U.S. 335 (1963). But that right "attaches only at the initiation of adversary criminal proceedings[;] . . . before proceedings are initiated[,] a suspect in a criminal investigation has no constitutional right to the assistance of counsel." *Davis v. United States*, 512 U.S. 452, 456- 57 (1994) (citations omitted). A grand jury investigation is not itself a criminal proceeding, *see Mandujano*, 425 U.S. at 581, and the government had not otherwise initiated any proceedings against Smith before her testimony. Accordingly, because "[n]o criminal proceedings had been instituted against [Smith,] the Sixth Amendment right to counsel had not come into play," *id.*, and the government was under no obligation to advise her of the rights that amendment affords.

### D.     Outrageous Government Conduct

Finally, Smith argues that this Court should exercise its supervisory authority to suppress her grand jury testimony because the government's behavior, even if not flatly unconstitutional, was outrageous.  See Docket Item 33 at 17-18.  More specifically, she argues that the Second Circuit's decision in United States v. Jacobs, 547 F.2d 772 (2d Cir. 1976), supports suppression of her testimony.

In Jacobs, the Second Circuit affirmed the district court's order suppressing a defendant's false grand jury testimony and dismissing a perjury charge predicated on that same testimony.  Id. at 778.  The prosecutor had deviated from a "uniform practice" of encouraging target witnesses, such as the defendant there, to seek independent legal advice before giving grand jury testimony.  Id. at 773-74.  The court explained that although suppression was not required under Mandujano, it nevertheless was warranted both because the "perjury count . . . was essentially a strategic ploy which would make conviction on the substantive count easier if the counts were to be joined in a single trial" and because the defendant "would not be likely to escape conviction [on the substantive count] because of [the suppression order]."  Id. at 774-75.  In light of those troubling facts, the court chose to "exercise [its] extremely restricted assertion of supervisory power" to suppress the testimony as a means of "let[ting] our citizens know that equal justice is available to all."  Id. at 777, 775.

Even assuming that Jacobs remains good law,[1] it does not apply here.  Smith was not a target of the investigation.  See Docket Item 39-1 at 6.  She was a fact

---

[1] But see United States v. Myers, 123 F.3d 350, 355-56 (6th Cir. 1997) (observing that "the Supreme Court has severely curtailed the ability of federal courts to fashion remedies based upon their supervisory powers" and holding that "a violation by

14

witness expected to refute a target's asserted alibi.  *Id.*  Although this Court does not condone the FBI's failure to record service of the subpoena, it does not find this error to be so outrageous as to warrant suppression of the resulting testimony.  Indeed, Smith does not contest that the FBI agent and BPD detective interviewed her on July 11, 2018, *see* Docket Item 33 at 5, strongly supporting the inference that she had at least constructive knowledge of the subpoena.  And regardless, the long and short of the matter is that Smith had neither a right to refuse to comply with the subpoena nor a right to testify falsely.  *See Mandujano*, 425 U.S. at 572, 577.

Smith's request that this Court exercise its discretion to suppress her testimony therefore is denied.

### E.     Disqualification of AUSA Molisani

Smith also has moved to disqualify AUSA Molisani from the prosecution of her case because he "is likely a witness."  *See* Docket Item 33 at 2-3.  "[C]all[ing] government counsel as a witness . . . inevitably confus[es] the distinctions between advocate and witness, argument and testimony," and "is acceptable only if required by a compelling and legitimate need."  *United States v. Schwartzbaum*, 527 F.2d 249, 253 (2d Cir. 1975).  Smith does not offer any reason for calling AUSA Molisani as a witness, much less a "compelling and legitimate" one.  The motion accordingly is denied.  Any confusion that might result from AUSA Molisani's having questioned Smith before the 2018 grand jury can be prevented, as the government suggests, *see* Docket Item 39 at 18-19, by removing his name from the relevant transcripts.

---

the government of its internal operating procedures, on its own, does not create a basis for suppressing . . . grand jury testimony" (citations omitted)).

## **CONCLUSION**

For the reasons stated above, the defendant's motion to dismiss the indictment or otherwise suppress her grand jury testimony, Docket Item 33, is DENIED. The defendant's motion to disqualify AUSA Molisani, *id.* at 2-3, also is DENIED. And to the extent the defendant seeks other relief, *see id.* at 1-3, that relief is DENIED for the reasons stated earlier by United States Magistrate Judge H. Kenneth Schroeder, Jr., *see* Docket Item 21.

SO ORDERED.

Dated:   April 23, 2020

Buffalo, New York

*Hon. Lawrence J. Vilardo*
_____
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE